# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JAMES RATAJCZAK,

               Petitioner,              Case Number: 2:08-cv-10102

v.                                  HONORABLE ARTHUR J. TARNOW

KENNETH ROMANOWSKI,

               Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY

Petitioner James Ratajczak has filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner, who is currently incarcerated at the Mound Correctional Facility in Detroit, Michigan, challenges his convictions for second-degree murder, felonious assault, and two counts of felony firearm. For the reasons set forth below, the Court denies the petition.

### I.

Petitioner's convictions arise from the shooting death of Fitz (Mike) Evans at Petitioner's home in Portsmouth Township, Bay County, Michigan on February 8, 2000. The prosecution alleged that Petitioner, with premeditation and deliberation, killed Evans because the two were involved in a landlord-tenant-related dispute. The defense theory was that Petitioner retrieved a gun in an attempt to defend his girlfriend, Anita Breitner Stone, fired warning shots, and that the gun then accidentally discharged in Evans' direction.

Evans' girlfriend, Lolita McCall, testified that she and Evans moved into Petitioner's home in September 1999. They lived in the basement of the home. On February 8, 2000, she was in the living area of the basement watching television and Petitioner, Evans and Stone were

talking in the laundry room. She heard their discussion become heated, but did not know what they were arguing about. She joined them in the laundry room. Petitioner then left the laundry room and went upstairs. McCall testified that Petitioner returned with a gun less than a minute later. She heard gunshots before she saw Petitioner. Then, he came downstairs to the doorway of the laundry room. McCall testified that Petitioner shouldered a rifle, aimed it at Evans, and fired a shot. He then pointed the gun at her. She rolled up into a ball on the floor. Petitioner then ran up the stairs.

Anita Breitner Stone testified that she and her son Sujan, then six years old, moved into Petitioner's home at the end of December 1999. Within a month of her moving in, tensions developed with Evans. Evans was unhappy that Stone smoked in the house, that her son made noise, and that, since his arrival, he had been relegated to the basement, rather than enjoying full run of the house as he had before she moved in. A week before the shooting, Evans chased her up the basement stairs after an argument. Petitioner intervened and defused the situation. She also testified that Evans had threatened her, Petitioner, and her son.

Stone testified that she and Petitioner decided that Evans should be asked to move out of the house. They decided they would confront Evans on February 8, 2000. At approximately 3:00 p.m., on that day, Petitioner brought two guns into the house, a rifle and a handgun. A few hours later, Petitioner's brother came to pick up Stone's son because they anticipated that Evans might become violent when they confronted him and she did not want her child to witness that. At approximately 8:00 p.m., she and Petitioner went downstairs to confront Evans. Unbeknownst to Petitioner, Stone placed the handgun in the waistband of her pants before going downstairs. She testified she did so because she feared Evans.

Petitioner and Evans got into a heated argument that lasted fifteen to twenty minutes. Petitioner then left the basement. In his absence, Stone continued arguing with Evans. Two to five minutes later, she heard gunshots coming from upstairs. She then saw Petitioner standing in the doorway to the laundry room. Stone saw Petitioner point the gun at Evans. She testified that she did not remember seeing Petitioner shoot Stone. She just remembered that at some point Evans was on the floor, having been shot. Stone remembered Petitioner also pointing the gun at McCall and threatening to shoot her. After Evans was shot, Petitioner left the basement. She followed him and found him in his bedroom where he was on the phone, apparently with a 911 operator.

Dr. Kanu Virani, a forensic pathologist, testified that he performed an autopsy on the victim. The victim died of a gunshot would to the chest. The wound was 46½ inches above the ground if Evans were standing.

Petitioner testified in his own defense. He testified that he and Evans were good friends and he permitted Evans to stay in his home beginning in September 1999. He knew Evans owned guns, that Evans had been violent toward women, and Evans once told Petitioner he had killed someone. Petitioner testified that he called the Bay City Police Department and Michigan State Police prior to the shooting. Petitioner then went to the basement to talk to Evans. He told Evans that he had called the police because Evans had been threatening him and Stone. Stone followed Petitioner downstairs and began arguing loudly with Evans. Petitioner testified that Evans then punched him on the chin and threatened to beat him to death.

Petitioner left the basement. He continued to hear Evans and Stone arguing. He testified that he wanted to return to the basement because he feared for Stone's safety, but he was afraid

to return.  He went into his bedroom and grabbed a rifle.  Petitioner testified that he grabbed the

rifle because he was afraid Evans would hurt or kill him.  He reached the landing of the

basement stairs and decided to fire warning shots in an attempt to get Evans to stop arguing with

Stone.  Petitioner fired four shots.  It was then very quiet in the basement.  Petitioner walked

down the basement stairs and approached the laundry room.  He saw Evans standing in the

laundry room.  Evans' arm moved and Petitioner flinched.  Petitioner testified that, when he

flinched, the gun accidentally discharged.  Petitioner ran upstairs and called 911.

## II.

Following a jury trial in Bay County Circuit Court, Petitioner was convicted of second-

degree murder, felonious assault, and two counts of felony firearm.  On June 12, 2002, he was

sentenced to 20 to 35 years' imprisonment for the second-degree murder conviction, 23 months

to four years for the felonious assault conviction, and two terms of two years for the felony-

firearm conviction.

Petitioner's appellate counsel filed a motion for new trial in the trial court seeking an

evidentiary hearing on Petitioner's ineffective assistance of counsel claim.  Petitioner argued that

counsel was ineffective in failing to elicit testimony that Petitioner had a cut on his chin, failing

to request a self-defense instruction, failing to object to the judge taking judicial notice of the

landlord-tenant law, failing to ask the judge to take judicial notice of the law governing

misdemeanors, and failing to object to prosecutorial misconduct.  The trial court granted an

evidentiary hearing.  The evidentiary hearing was conducted on October 23, 2003.  Trial counsel

was the only testifying witness.  Several months after the evidentiary hearing, the trial court

issued an order denying Petitioner's motion for a new trial. *People v. Ratajczak*, No. 00-1225

(Bay County Circuit Court May 27, 2004).

Petitioner filed an appeal of right in the Michigan Court of Appeals, raising the following

claims:

I.  Where a defense of accidental discharge is offered, the trial court erred
    reversibly when it allowed the jury to experiment with the weapon which
    was no longer in the same condition as it was on the day of the incident.

II. Prosecutorial misconduct denied appellant due process of law in the following
    ways:

    A.  The prosecutor appealed to the emotions of the jury to obtain a conviction
        by displaying throughout trial a poster-sized photograph of the
        complainant and the bloody t-shirt.

    B.  The prosecutor who is charged with knowing the law argued that the
        Michigan State Police would not refuse to respond to a misdemeanor call.

III. Appellant was denied the effective assistance of counsel in the following ways:

    A.  Counsel failed to bring forth evidence which would have corroborated the
        defendant's testimony that he had been hit by the complainant and would
        have supported his defense of self defense.

    B.  Counsel failed to object to the court taking judicial notice of landlord
        tenant law and failed to object to the court's findings that the deceased and
        the defendant were in a landlord-tenant relationship.

    C.  Defense counsel failed to object to prosecutorial misconduct.

    D.  Counsel either failed to secure an instruction on or failed to ask the court
        to take judicial notice of M.C.L. 764.15 or failed to explain to the jurors
        that the call reported a non-criminal problem to which the police are not
        required to respond.

    E.  Defense counsel failed to object to the court's re-instruction on the
        defense of accident.

IV.     The trial court erred when it took judicial notice of facts which had not been proven and were open to dispute and where it took judicial notice of a law that was irrelevant.

V.      The appellant was denied his right to a properly instructed jury when the trial court refused to instruct on the defense of self defense and when it excluded consideration of the defense of accident from the offense of second-degree murder based on the third mental state.

VI.     Appellant was denied due process of law and his right to a proportionate sentence where the court erred in scoring offense variables 7 and 9.

Petitioner filed the following additional claim in a *pro per* supplemental brief:

VII.    The sentence imposed by the court violated appellant's right to trial by jury, the right to due process of law, and the right to be free from excessive punishment.

The Michigan Court of Appeals affirmed Petitioner's convictions and sentences. *People v. Ratajczak*, No. 242715 (Mich. Ct. App. Jan. 13, 2005).

Petitioner filed an application for leave to appeal in the Michigan Supreme Court, raising the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Ratajczak*, No. 128128 (Mich. July 26, 2005).

Petitioner then filed a motion for relief from judgment in the trial court, raising the following claims: (i) Petitioner was absent when the bailiff was sworn; (ii) the 911 operator should have been permitted to testify as to the content of the phone calls and that hang-up calls were received; (iii) post-arrest, pre-*Miranda* statements were improperly admitted; (iv) jurors improperly commenced deliberations before jury was reduced to 12 jurors; (v) trial court improperly took judicial notice of landlord-tenant law and it was ineffective for counsel to fail to object; (vi) counsel was ineffective for failing to object to prosecutorial misconduct; (vii) two witnesses were permitted to commit perjury; (viii) prosecutor committed misconduct when he called Petitioner a "liar" in closing argument; (ix) prosecutor committed misconduct by calling

defense arguments a "red herring;" (x) counsel was ineffective for failing object to various instances of misconduct and improper rulings; (xi) counsel was ineffective for failing to raise a pre-trial motion to suppress Petitioner's statements; (xii) trial counsel was ineffective for failing to hire an expert witness; (xiii) trial counsel was ineffective for failing to request a jury instruction on accident; (xiv) jury was improperly permitted to have murder weapon in jury room; (xv) trial counsel failed to impeach prosecution witnesses; (xvi) cumulative effect of alleged errors warrants a new trial; (xvii) trial counsel improperly failed to suppress certain exhibits; (xviii) search warrant was not based on probable cause; and (xix) jury was not a fair cross-section of the community.  The trial Court denied the motion for relief from judgment. *People v. Ratajczak*, No. 00-1225-FC-C (Bay County Circuit Court Apr. 26, 2007).

Petitioner filed an application for leave to appeal in the Michigan Court of Appeals.  The Michigan Court of Appeals denied leave to appeal.  *People v. Ratajczak*, No. 278055 (Mich. Ct. App. July 19, 2007).  Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, which was also denied.  *People v. Ratajczak*, No. 134624 (Mich. Dec. 28, 2007).

Petitioner then filed the pending petition for a writ of habeas corpus, raising the following claims:

I.     The trial judge, over defense counsel's objection, permitted the jury to test the trigger for pull on the rifle that fired the fatal bullets in the jury room.

II.    The trial court violated Petitioner's constitutional rights when it took judicial notice of facts which had not been proven and were open to dispute and where it took judicial notice of a law that was irrelevant.

III.    The trial court refused to instruct the jury on the defense of self defense and it excluded consideration of the defense of accident.

IV.    The prosecutor's misconduct denied Petitioner due process of law.

V.   Petitioner's trial and appellate counsels were ineffective within the meaning of the Sixth Amendment which severely prejudiced the Petitioner:

1.   failed to provide evidence that the victim hit Petitioner

2.   failed to object to prosecutorial misconduct

3.   failed to secure an instruction regarding MCL 764.15

4.   regarding deputization of stenographer

5.   regarding the cross-examination of Schultz

6.   regarding *Miranda* challenge

7.   allowing the alternate jurors to deliberate

8.   allowing Schultz to commit perjury

9.   allowing prosecutor to call Petitioner a liar

10.   allowing prosecutor to call defense a red herring

11.   allowing prosecutor to strike foul blows

12.   failure to hire expert witness

13   failing to request an accident instruction

14   failed to impeach witness McCall

VI.   The state courts erroneously relied on Michigan's finality rule, MCR 6.508(D) to deny Petitioner's successive action even though he presented ample proofs that he was denied effective assistance of trial and appellate counsels.

## III.

Section 2254(d) of Title 28 U.S.C., imposes the following standard of review for habeas

cases:

An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 410-11.

## IV.

### A.

Petitioner argues that his right to due process, right to cross-examine and confront witnesses against him and his right to counsel were violated when jurors performed a trigger pull test outside the presence of Petitioner. During deliberations, the jury sent a note to the judge stating: "The jurors would like to see the rifle, with the intent to try the trigger for pull." Tr.,

2/22/02, at 5.  The court allowed the jury to receive the rifle in the jury room, with the following cautionary instruction:

> The jury should be aware, however, that the condition the rifle is in today may not be the condition the rifle was in on February the 8th, 2000.  For example, then, the gun was loaded; had a magazine; had been previously fired four times.  The bolt may have been opened and the spring may have been compressed for the past two years; and the gun has been . . . scientifically tested since then, which may or may not change the conditions of the rifle.

*Id.* at 27.

"As a matter of law, clearly established Supreme Court precedent requires that a criminal defendant be afforded the right to confront the evidence and the witnesses against him, and the right to a jury that considers only the evidence presented at trial."  *Doan v. Brigano*, 237 F.3d 722, 733 n.7 (6th Cir. 2001) (citations omitted), *overruled on other grounds by Wiggins v. Smith*, 539 U.S. 510 (2003).  "Thus, under clearly established federal law, jury exposure to extrinsic evidence or other extraneous influence violates a defendant's Sixth Amendment rights, . . . and a state court decision that conflicts with this rule may justify habeas relief under the standard set forth in the AEDPA."  *Fletcher v. McKee*, No. 08-1240, 2009 WL 4755293, *3 (6th Cir. Dec. 11, 2009).

An extraneous influence on a juror is "'one derived from specific knowledge about or a relationship with either the parties or their witnesses.'" *Garcia v. Andrews*, 488 F.3d 370, 376 (6th Cir. 2007) (*quoting United States v. Herndon*, 156 F.3d 629, 635 (6th Cir. 1998)). Examples of extraneous influence include "'prior business dealings with the defendant, applying to work for the local district attorney, conducting an out of court experiment, and discussing the trial with an employee.'" *Id.* (*quoting United States v. Owens*, 426 F.3d 800, 805 (6th Cir. 2005)).  Examples of "internal" influences include "the behavior of jurors during deliberations,

the jurors' ability to hear and comprehend trial testimony, and the physical and mental incompetence of a juror." *Williams v. Bagley*, 380 F.3d 932, 945 n.7 (6th Cir. 2004).

The Michigan Court of Appeals held that the jurors' experimentation with the murder weapon did not deprive Petitioner of his right to an impartial jury. The Michigan Court of Appeals reasoned that none of the jurors performed an experiment outside the jury room or outside the presence of other jurors. In addition, the jurors "relied on the testimonial and physical evidence introduced at trial, including the rifle itself, to test the parties' competing arguments. This test was a natural outgrowth of the jurors' discussions regarding what they heard during the trial." *Ratajczak*, 2005 WL at *2.

The Sixth Circuit Court of Appeals recently decide a case factually similar to Petitioner's. In *Fletcher v. McKee*, No. 08-1240, 2009 WL 4755293 (6th Cir. Dec. 11, 2009), Michael Fletcher challenged his second-degree murder conviction for the shooting death of his wife, Leann. Fletcher's defense was that Leann had accidentally shot herself. After the trial ended, ten jurors were interviewed on a national television broadcast and revealed that, during deliberations, they had conducted an experiment in the jury room to determine where the gun would have fallen if Leann had accidentally shot herself as claimed by the defense. Fletcher argued that this experiment created extrinsic evidence amounting to an extraneous influence on the jury, violating his Sixth Amendment right to be present during critical stages of the trial, to the assistance of counsel, and to confrontation.

The Sixth Circuit held that the "jury room reenact using trial exhibits and testimony was part of the jury's private, internal deliberations and did not violate Fletcher's Sixth Amendment rights." *Id.* at *1. The Court noted that "[w]here no extraneous influence is present,

courts will not intrude into matters internal to jury deliberations." *Id.* at \*3. "'There is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room.'" *Id.* at \*4 (*quoting United States v. Abeyta*, 27 F.3d 470, 477 (10th Cir. 1994)).

In the present case, as in *Fletcher*, the experiment conducted by the jury utilized trial exhibits and testimony. "[J]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict. *U.S. v. Avery*, 717 F.2d 1020, 1026 (6th Cir. 1983). The testing of the weapon did not result in extrinsic evidence. Petitioner has not cited and the Court has not found any supreme Court case suggesting that the handling of admitted evidence amounts to a violation of a defendant's right of confrontation, right to an impartial jury, or any other constitutional right. Thus, the Court concludes that the state court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

**B.**

Petitioner argues that the trial court improperly took judicial notice of landlord-tenant law and the requirements under Michigan law for evicting a tenant and relied on facts not in evidence in doing so, specifically, that Petitioner and Evans had a landlord-tenant relationship. Petitioner claims that this relieved the state of its burden of proof and denied Petitioner an opportunity to cross-examine on the evidence.

It is not the role of a federal court on habeas review "to decide whether a state trial judge's decision whether to admit evidence pursuant to state evidentiary rules was a proper one." *Byrd v. Collins*, 209 F.3d 486, 528 (6th Cir. 2000). The federal court's "sole task is to decide

whether federal constitutional violations have occurred." *Id. citing Marshall v. Lonberger*, 459 U.S. 422, 438 n. 6, (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."). "Errors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Roe v. Baker*, 316 F.3d 557, 567 (6th Cir.2002). "When reviewing a state court's evidentiary determination pursuant to § 2254, a federal appellate court may not grant a petitioner's request for relief simply because it would have decided the evidentiary question differently than the state court." *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). A federal court may only grant habeas relief if the petitioner is able to show that the state trial court's evidentiary rulings were in conflict with a decision reached "by the [Supreme] Court on a question of law or if the state court [decided the evidentiary issue] differently than [the Supreme] Court [did] on a set of materially indistinguishable facts." *Id. quoting Williams v. Taylor*, 529 U.S. 362, 412 (2000).

The Michigan Court of Appeals held that judicial notice of landlord-tenant law was proper under Michigan Rule of Evidence 202(b), which requires a court to take judicial notice of Michigan law where a party requests it do so. This ruling is premised entirely on application of state law. Nothing in this ruling was contrary to rulings of the United States Supreme Court on a similar question of law, nor did the state courts decide the evidentiary issues differently than the Supreme Court in a case with materially indistinguishable facts. Consequently, there has been no infringement of a right guaranteed by the United States Constitution.

**C.**

In his third habeas claim, Petitioner argues that the trial court improperly denied his request for a self-defense instruction and excluded consideration of an accident defense. The trial court gave a defense of others instruction regarding Petitioner's testimony that he feared for the safety of his girlfriend Anita Breitner.

It is well established that the failure to give a self-defense instruction "does not deprive the defendant of his constitutional right to due process if the evidence produced during trial was insufficient to warrant such an instruction." *Allen v. Morris*, 845 F.2d 610, 617 (6th Cir. 1988); see also, *Gimotty v. Elo*, 40 F. App'x 29, 33-34 (6th Cir. 2002). Under Michigan law, a defendant is entitled to instruction on a defense theory of the case where the instruction is supported by the evidence presented at trial. *See People v. Mills*, 450 Mich. 61, 81, 537 N.W.2d 909, 919-20 (1995). The Court of Appeals for the Sixth Circuit has held that "[g]enerally, a defendant is entitled to jury instructions on defense theories that are supported by law and raised by the evidence presented." *Williams v. Kentucky*, 124 F.2d 201, 204 (6th Cir. 1997). "While a defendant is entitled to have a jury instruction on any defense which provides a legal defense to the charge against him. . . the failure to give such an instruction will not alone mandate the issuance of a writ of habeas corpus." *Sanders v. Israel*, 717 F.2d 422, 425 (7th Cir. 1983) (internal citations omitted).

Petitioner testified that he and Evans were arguing and that Evans was also arguing with his girlfriend Anita Breitner Stone. Petitioner testified that Evans threatened him. Petitioner left the basement. He could still hear Evans and Stone arguing. Petitioner stated that he was fearful of Evans. Petitioner went to his bedroom, retrieved a rifle and went back to the basement door.

He testified that he returned to the basement door rather than leaving the house because he felt that Stone was in danger and he did not want to leave her in the basement with Evans. Petitioner testified that he knew Evans had a history of violence against women and that this was something he had heard Evans brag about. Petitioner could hear Evans and Breitner arguing. He could not muster the will to go down the basement steps, so he stood at the top of the stairs and fired several warning shots with the intention of frightening Evans.

After firing the warning shots, Petitioner descended the steps to the basement. He found Evans standing by the laundry room. Petitioner was surprised that Evans was not in a submissive or conciliatory pose. Petitioner testified that Evans appeared not at all cowered by the gunshots. Petitioner's rifle was pointed at Evans. Petitioner saw something move out of the corner of his eye and he flinched. He testified that the flinching caused the gun to discharge accidentally. On cross-examination, Petitioner testified that when he retrieved his gun, when he walked to the basement door, when he fired the warning shots, and when he descended the basement steps, his only thought was of Stone and rescuing her.

Given Petitioner's own testimony that his focus was on saving Breitner, it was not unreasonable for the trial court to conclude that a defense of others instruction was warranted, while a self-defense instruction was not.

Petitioner also argues that the trial court improperly excluded from the jury's consideration the defense of accident. The jury was instructed on the defense of accident. Therefore, this claim is denied.

**D.**

Petitioner argues that he was denied his right to a fair trial because the prosecutor engaged in misconduct. Specifically, Petitioner argues that the prosecutor committed misconduct by: (i) appealing to the emotions of the jurors by displaying throughout the trial a poster-sized photo of the victim and his bloody t-shirt; (ii) incorrectly arguing that the Michigan State Police would not refuse to respond to a misdemeanor call; (iii) misrepresenting testimony; and (iv) "arg[uing] half-truths."

Respondent argues that these prosecutorial misconduct claims are procedurally defaulted. "[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), *citing Lambrix v. Singletary*, 520 U.S. 518, 525 (1997). "Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds that the interests of judicial economy are best served by addressing the merits of Petitioner's prosecutorial misconduct claims.

It is well-established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct may warrant habeas corpus relief only if the misconduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168,

181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'"  *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).  The Court must examine "'the fairness of the trial, not the culpability of the prosecutor.'"  *Pritchett*, 117 F.3d at 964 (quoting *Serra v. Mich. Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

The first question to consider is whether the prosecutor's conduct or remarks were improper.  *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006).  If they were, the Court must decide whether the improper acts were so flagrant as to warrant relief.  *Id*. at 516.  The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine whether it was flagrant:  "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally."  *Id*. (citation omitted).

Petitioner's first claim of prosecutorial misconduct is that the prosecutor evoked juror sympathy by displaying Evans' bloody t-shirt several times during the trial and displaying a poster-size photograph of Evans throughout the trial.  During Petitioner's motion for new trial, Petitioner's counsel withdrew her claim that the photograph of Evans was displayed throughout the trial.  She stated that, in fact, the photograph was removed prior to defense counsel's opening statement.  The Court therefore considers whether displaying the photograph and t-shirt for limited times during the proceedings constituted prosecutorial misconduct.  "[A]rguments that encourage juror identification with crime victims are improper."  *Johnson v. Bell,* 525 F.3d 466,

484 (6th Cir. 2008). A prosecutor acts improperly when the prosecutor "calls on the jury's emotions and fears – rather than the evidence – to decide the case." *Id.* The prosecutor's use of Evans' photograph and bloody t-shirt may have evoked sympathy for Evans, but the prosecutor did not ask the jury to convict on that basis. The bloody t-shirt was displayed during the testimony of the Michigan State Police firearms expert. It was used by the firearms expert to explain the position of the rifle in relation to the victim when he was shot. Accordingly, the Court finds that the prosecutor's use of these items and comments about them were not improper.

Next, Petitioner argues that the prosecutor improperly questioned Petitioner's testimony that police advised him they did not respond to misdemeanors. In his closing statement, the prosecutor argued: "Is there any among you who believe that the police will not respond to a call for a misdemeanor?" Petitioner argues that this argument was unfair because Mich. Comp. Laws § 764.15 states that a police officer is not authorized to arrest someone for a misdemeanor. The statute cited by Petitioner allows police officers to arrest a person on suspicion that the person has committed a misdemeanor if certain conditions are met. Moreover, even assuming Evans' conduct would not have justified a warrantless arrest, this does not mean that police would not have *responded* to a call. Therefore, Petitioner has not shown that the prosecutor's comment was improper or inaccurate.

Petitioner argues that the prosecutor inaccurately summarized the facts adduced at trial when he argued that McCall heard Petitioner to tell Evans to "shut up." The record supports the prosecutor's argument. McCall testified that Petitioner repeatedly told Evans to shut up before he shot him. This claim of prosecutorial misconduct, therefore, is not support in the record.

Finally, Petitioner alleges that the prosecutor argued several more "half-truths."  The Court has reviewed the alleged inaccurate arguments by the prosecutor and finds that the prosecutor's arguments did not mischaracterize or inaccurately summarize the testimony adduced at trial. While the prosecutor highlighted the testimonial evidence most favorable to the prosecution, the prosecutor did not misstate the evidence.  Accordingly, habeas relief is denied on this claim.

### E.

Petitioner asserts fourteen claims of ineffective assistance of trial and appellate counsel. To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance."  *Id.* at 689.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.* at 687.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'" *Tinsley v. Million*, 399 F.3d 796, 802 (6th Cir. 2005), *quoting Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).

Ineffective assistance of appellate counsel claims are governed by the same *Strickland* standard as ineffective assistance of trial counsel.  *See Smith v. Robbins*, 528 U.S. 259, 285

(2000). The same deference owed by a court to a trial attorney in reviewing that attorney's performance is owed to an appellate attorney. "Counsel's performance is strongly presumed to be effective." *Scott v. Mitchell*, 209 F.3d 854, 880 (6th Cir. 2000) (*citing Strickland*, 466 U.S. at 690).

**1.**

First, Petitioner argues that his trial attorney was ineffective in failing to elicit testimony that he had been struck by Evans. Petitioner argues that such testimony would have supported a self-defense theory. Petitioner testified at trial that, on the night of the shooting, before he retrieved the gun from his bedroom, Evans punched him on the chin. During the preliminary examination., Sheriff's Deputy John Ruterbusch testified that he had contact with Petitioner on the night of the shooting. Deputy Ruterbusch testified that he sat in an interrogation room with Petitioner after Petitioner invoked his right to counsel. Deputy Ruterbusch testified that Petitioner volunteered several statements to him regarding the shooting even though deputy Ruterbusch did not interrogate Petitioner. Deputy Ruterbusch testified that, at one point, he noticed blood a trickle of blood on Petitioner's neck. Deputy Ruterbusch gave Petitioner a paper towel to clean the blood. Deputy Ruterbusch did not notice any blood on Petitioner's chin or neck when he first entered the interview room. Deputy Ruterbusch testified that, when Petitioner was talking to him, Petitioner was agitated and grabbing his chin. The paper towel Deputy Ruterbusch gave Petitioner took care of the blood and no new blood became visible.

At the state court *Ginther* hearing, Petitioner's attorney testified regarding his failure to cross-examine Deputy Ruterbusch regarding the cut on Petitioner's chin. His recollection regarding the decision not to elicit this testimony was less than complete. He recalled generally

that he had discussed the cut on Petitioner's chin with Petitioner and that Petitioner was uncertain as to the cause of the cut. Petitioner thought the cut could have been caused by Evans punching him, but, he also thought that it may have been caused by him scratching himself.

The Michigan Court of Appeals held that counsel was not ineffective in failing to elicit testimony regarding the cut. The state court concluded that counsel's decision was the result of sound trial strategy. Petitioner has not shown that he was prejudiced by counsel's decision not to elicit testimony regarding the cut on his chin. While it may have shown that Evans was potentially violent on the day of the shooting, it would not have justified or excused the shooting. Petitioner's trial testimony was not consistent with a defense of self-defense and the shooting did not happen immediately after Evans allegedly struck Petitioner. Therefore, the Court concludes that the state court's application of *Strickland* was not unreasonable.

**2.**

Second, Petitioner argues that counsel was ineffective in failing to object to the instances of prosecutorial misconduct. As discussed above, Petitioner failed to show that the prosecutor engaged in misconduct. Therefore, counsel was not ineffective in failing to object.

**3.**

Third, Petitioner claims that counsel was ineffective in failing to ask the court to take judicial notice of Mich. Comp. Laws § 764.15, which governs arrests without a warrant. Petitioner argues that citation of that statute would have supported his claim that, prior to the shooting, he contacted the Michigan State Police and Bay City Police Department, but they failed to respond. As discussed above, § 764.15 allows a warrantless arrest on suspicion of a misdemeanor offense under certain circumstances. The conduct Petitioner alleges the victim

engaged in likely would have been encompassed within those circumstances. Moreover, whether or not a police officer could have arrested the victim based upon his conduct does not prove that the police would or would not have at least responded to the call. Petitioner has not shown that the counsel's decision not to request judicial notice of this statute or a jury instruction prejudiced his defense.

**4.**

Fourth, Petitioner argues that he was denied his right to counsel at a critical stage of the proceedings when neither he nor trial counsel were present when the trial court deputized the court stenographer as the bailiff. Petitioner argues that the deputizing of the stenographer was a matter involving a substantive communication with the jury and Petitioner or counsel were entitled to be present. The trial court, last state court to issue a reasoned opinion regarding this claim denied the claim because Petitioner failed to present any authority holding that a constitutional right was violated. The trial court held that the swearing of a bailiff is not a "critical stage" of the proceedings.

An accused has the right to be present at every critical stage of a trial "where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n. 15 (1975) (citations omitted). The Court agrees that the task of swearing in a bailiff was ministerial, rather than a "critical stage" of the proceedings, and had no bearing upon Petitioner's ability to defend himself. Therefore, habeas relief is denied on this claim.

**5.**

Next, Petitioner argues that the trial court interfered with counsel's cross-examination of witness Stacey Schultz. Petitioner raises this claim under the ineffective assistance of counsel

point heading. The claim, however, alleges an error by the trial court rather than trial counsel. Stacey Schultz was the 911 operator who fielded several calls from Petitioner's residence on the day of the shooting. The 911 tape was played for the jury. The 911 tape recorded a conversation between Schultz and Anita Stone, with Petitioner's voice apparently audible at some point. The tape showed that the call was disconnected several times. At the preliminary examination, Schultz testified that the call was disconnected by Stone. At trial, she testified she was uncertain whether the call was disconnected by Stone. Defense counsel attempted to clarify her testimony on this point and make an educated guess as to who disconnected the call. The prosecutor's objection was sustained because an educated guess would be speculative and not properly considered.

While the right to present a defense is a fundamental tenet of due process, "a defendant's right to present evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 307-08 (1998). The exclusion of evidence is unconstitutional where it "infringe[s] upon a weighty interest of the accused." *Id.* The Court finds that the trial court's decision that the 911 operator could not speculate as to who disconnected the call did not deny Petitioner "'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), *quoting California v. Trombetta*, 467 U.S. 479, 485 (1984).

**6.**

The next claim challenges the admission of a statement made by Petitioner to police while he was being transported to the police station and before he was advised of his *Miranda*

rights.[1]  Gerald Roupe testified that, at the time of the shooting, he worked as a detective for the

Bay County Sheriff's Department.  He was dispatched to the scene of the shooting and found

Petitioner in the back of a patrol car.  Detective Roupe removed Petitioner from the backseat of

that vehicle and placed him in another patrol car to be taken to the Law Enforcement Center.

While in the vehicle, Detective Roupe asked Petitioner his name, which Petitioner gave.  He

asked Petitioner whether he lived at the residence where the shooting occurred.  Petitioner stated

that he owned the home.  Detective Roupe then asked Petitioner how old he was, to which

Petitioner responded thirty-seven.  Detective Roupe remarked that Petitioner did not look thirty-

seven.  According to Detective Roupe, Petitioner responded, "Yeah, right, I didn't act my age

tonight either."  Tr., 2/14/02 at 49.

As a general rule, police must read *Miranda* warnings prior to interrogating a suspect in

custody.  *Miranda v. Arizona*, 384 U.S. 436 (1966).   These procedural safeguards are "required

not where a suspect is simply taken into custody, but rather where a suspect in custody is

subjected to interrogation."  *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980).  With respect to

what constitutes interrogation warranting *Miranda* safeguards, the Supreme Court has held:

> "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure
> of compulsion above and beyond that inherent in custody itself. [footnote
> omitted]

> We conclude that the *Miranda* safeguards come into play whenever a person in
> custody is subjected to either express questioning or its functional equivalent.
> That is to say, the term "interrogation" under *Miranda* refers not only to express
> questioning, but also to any words or actions on the part of the police (other than
> those normally attendant to arrest and custody) that the police should know are

---

[1]  Petitioner raises this claim in the context of his claim that appellate counsel was
ineffective for failing to present this claim on direct review.

reasonably likely to elicit an incriminating response [footnote omitted] from the suspect. . . .

*Id.* at 300-01.

The detective's comment to Petitioner that he did not appear to be thirty-seven years old was not reasonably likely to elicit an incriminating response. *See U.S. v. Goist*, 59 F. App'x 757, 763 (6th Cir. 2003) (finding that suspect's incriminating custodial statement, made while engaged in small talk with investigating officer, was not product of interrogation); *accord U.S. v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) ("Incriminating statements made in the course of casual conversation are not products of custodial interrogation."). Because Petitioner's decision to link his age to his actions that day was spontaneous and not the result of coercion or interrogation, the Court finds that it was properly admitted. Consequently, appellate counsel was not ineffective in failing to raise this claim on appeal.

**7.**

Petitioner's seventh claim alleges that the trial court erred in allowing two alternate jurors to deliberate with the jury.

The record shows that, after the instructions were read, the trial court judge told the jury, "I'm going to ask you to step into the jury room for just a minute, and then I'm going to bring you back in to reduce you to 12." Tr., 2/21/02 at 63. After the jury was excused, the parties discussed a clarification to the jury verdict form. Three minutes later, the jury returned to the courtroom and the clarification was explained to them.

The trial court, in denying Petitioner's motion for relief from judgment, held that no violation of Petitioner's due process rights occurred, reasoning, in relevant part:

> The record reflects that the jury left the courtroom at 2:24 p.m., had to travel to the jury room through the secured back hallways. The 14 seated jurors then returned to the courtroom at 2:27 p.m. at which time the jury was reduced to 12 jurors. The Defendant argues that all 14 jurors could have begun deliberating during those 3 minutes they were out of the courtroom. . . . The Court finds this argument to be purely speculative and without legal basis. The jurors had been instructed not to begin deliberations until they were alone with the 12 of them. The Jurors had to walk out of the courtroom, through a secured hall, through a door and down the hall to the jury room while being accompanied by the jury clerk. This Court finds that this ministerial process of determining if the jury instructions were correct, outside the presence of the jurors, did not deny the Defendant due process.

*Ratajczak*, slip op. at 5.

There is no evidence that any deliberations occurred during that three-minute break. Prior to the reading of the instructions, the trial court advised the jury that they would begin deliberations after the jury had been reduced to twelve. Other than a conclusory allegation, there is no reason to believe that the jurors did not follow the trial court's instruction and wait until the alternate jurors had been excused to begin their deliberations. Thus, the Court finds that the trial court's decision was not contrary to or an unreasonable application of Supreme Court precedent.

**8.**

In his eighth claim of ineffective assistance of counsel, Petitioner argues that two witnesses, Stacey Schultz and John Ruterbusch, presented false testimony and that had counsel conducted adequate investigation, he would have discovered that the testimony was false.

Petitioner has failed to identify specifically the testimony he claims was false. He fails to provide any support for his claim that the testimony was false or to explain how counsel could have discovered that the testimony was false. Petitioner's conclusory allegations that counsel was ineffective in this regard are insufficient to warrant habeas relief.

**9.**

Next, Petitioner argues that the prosecutor engaged in misconduct by calling Petitioner a "liar," and calling the defense a "red herring." Presumably, these claims are included in the ineffective assistance of counsel section because Petitioner is alleging that counsel was ineffective in failing to object.

An ineffective assistance of counsel claim based on trial counsel's failure to object to prosecutorial misconduct "hinges on whether the prosecutor's misconduct was plain enough for a minimally competent counsel to have objected." *Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000). "It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying." *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005), *citing United States v. Young*, 470 U.S. 1, 17-19 (1985).

> There are two separate harms that arise from such misconduct. First, "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." *Young*, 470 U.S. at 18, 105 S.Ct. 1038. Second, "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at 18-19, 105 S.Ct. 1038.

*Hodge*, 426 F.3d at 378. However, "this does not mean that the prosecution cannot attack the defendant's credibility or even assert that the defendant is lying." *West v. Bell*, 550 F.3d 542, 545 (6th Cir. 2008).

> [A] prosecutor may assert that a defendant is lying during her closing argument when emphasizing discrepancies between the evidence and that defendant's testimony. To avoid impropriety, however, such comments must reflect reasonable inferences from the evidence adduced at trial. Again, misconduct occurs when a jury could reasonably believe that the prosecutor was, instead, expressing a personal opinion as to the witness's credibility.

*United States v. Francis*, 170 F.3d 546 (6th Cir. 1999).

In *Hodge*, the Sixth Circuit addressed allegations of prosecutorial misconduct in the context of a claim that counsel was ineffective in failing to object to the conduct. The Sixth Circuit held that the prosecutor engaged in misconduct when asserting that the defendant was "lying to extricate himself from what he's done," and, "compounded the misconduct" by claiming that the victim and her family were "absolutely believable." *Id.* at 377. In reaching this conclusion, the Court of Appeals found it significant that the prosecutor's statements on credibility were "often unsupported by any rational justification other than an assumption that Hodge was guilty," thereby suggesting to the jury that the prosecutor knew something they did not. *Id.* The Court of Appeals also noted that, "because these statements by the prosecutor were not coupled with a more detailed analysis of the evidence actually adduced at trial, they convey an impression to the jury that they should simply trust the State's judgment that [one of its key witnesses] was a credible witness and that the defendant's witnesses were non-credible, if not perjurious." *Id.* at 378-79. Additionally, the prosecutor in *Hodge* essentially vouched for the credibility of all the prosecution's witnesses by misstating and mischaracterizing the evidence adduced at trial and denigrated the defense and defense counsel in the process. The prosecutor also accused the defense's expert witness of acting wrongfully, unethically, and even perjuring himself with regard to any statements he made contradicting the State's expert witness. *Id.* at 383.

The prosecutor's comments in the instant case are distinguishable from those in *Hodge*. The use of the words "lying" and "liar" should be avoided. However, read in context, the prosecutor's argument clearly relied upon an analysis of the evidence adduced at trial. The argument did not appeal to the jury to accept the State's characterization of the Petitioner's

credibility. Instead, the prosecutor asked the jury to conclude, based upon the evidence presented, that Petitioner's testimony was not credible. He detailed Petitioner's testimony, the ways in which it contradicted other testimony presented, and the ways in which it was inherently incredible. The tenor of the prosecutor's closing and rebuttal arguments in this case was vastly different than that in *Hodge*. The prosecutor focused on the evidence as it related to Petitioner's testimony; for example, the prosecutor stated that the evidence did not support Petitioner's testimony, that Petitioner's testimony was "disputed by the mass of evidence in this case." Tr., 2/21/02 at 40. Thus, the Court finds that the prosecutor's use of the words "lying" and "liar" did not amount to misconduct.

A prosecutor's description of defense counsel's argument as a red herring is not *per se* improper. *See United States v. Bernard*, 299 F.3d 467, 487-88 (5th Cir. 2002); *United States v. Rivera*, 971 F.2d 876, 883 (2d Cir. 1992). Such arguments can be reversible error when the prosecutor makes "personal, unsubstantiated attacks on the character and ethics of opposing counsel" and accuses defense counsel of conspiring with the defendant to fabricate testimony. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005). Here, the prosecutor's references to Petitioner's defense as a red herring was not a personal attack on defense counsel. The comment attacked the defense's theory on the merits and urged the jury to question the credibility of Petitioner's testimony.

The remarks of the prosecutor in this case, considered in context, would not mislead the jury into believing that the prosecutor was privy to some evidence not presented to the jury bearing upon Petitioner's credibility. The prosecutor's remarks that Petitioner was a liar were not extensive. They certainly did not permeate his closing argument, but were too frequent to be

characterized as isolated. The remarks do not appear to have been made with the deliberate intention of misleading the jury. Finally, the evidence against Petitioner was strong. Considering all of these factors, the Court concludes that the prosecutor's conduct in this case did not violate Petitioner's due process rights. Therefore, the Court concludes that counsel was not ineffective in failing to object to the conduct.

## 10.

In his tenth claim, Petitioner argues that trial counsel was ineffective in allowing the prosecutor to "strike foul blows" by mischaracterizing the offense of involuntary manslaughter. In arguing that Petitioner was guilty of an offense greater than involuntary manslaughter, the prosecutor argued that the offense of involuntary manslaughter was appropriate in a case in which, for example, a hunter aimed a gun at someone he thought was a deer and fired the gun. In contrast, the prosecutor argued, the offense at issue involved a greater intent than that given in the example. The prosecutor argued Petitioner intentionally aimed and fired the gun at the victim.

The prosecutor's comment, while not a particularly elucidating examination of involuntary manslaughter under Michigan law, was not a gross misstatement of the law, was isolated in nature and, given that the jury instructions correctly explained the elements of the offense, did not prejudice the defense. Therefore, counsel was not ineffective in failing to object to this isolated comment.

## 11.

Petitioner's eleventh claim of ineffective assistance of counsel is that counsel failed to hire an expert witness to rebut the ballistics evidence presented by the State.

In its opinion denying Petitioner's motion for relief from judgment, the trial court held, in pertinent part:

> The Defendant does not state why an expert witness was needed in this case. The Defendant admitted, and witness testimony supports the fact that the Defendant was the one handling the gun which shot and killed the victim. In the response brief, the Defendant argues that it was because his counsel "failed to investigate" which caused the prosecution's expert to be unnecessary [sic]. This is purely speculative on Defendant's part. Defense counsel made a decision not to hire a separate expert witness. There was no evidence that the bullet came from anything but the Defendant's weapon, which was in the Defendant's hand. This was trial strategy and this Court will not overturn on this basis.

*Ratajczak*, slip op. at 8.

During the *Ginther* hearing, defense counsel testified that he interviewed a ballistics expert, Reinhold Pope, with the Michigan State Police to assist him in evaluating the prosecution's expert testimony. He also interviewed a professor from Michigan State University about the ballistics testimony. After interviewing Pope and the professor, defense counsel concluded that a ballistics expert was not necessary for the defense because the prosecution's expert would offer testimony needed by the defense, presumably trigger-pull testimony. Defense counsel also testified that he interviewed a pathologist regarding measurements of the bullet holes detailed in the autopsy report. After interviewing the pathologist, he determined that the information reflected in the autopsy report was accurate and a defense expert witness not needed.

Petitioner has not explained what helpful information an expert witness for the defense may have offered. His allegations in this regard are conclusory and vague. Defense counsel's decision not retain a defense expert witness was based upon his investigation and reasoned conclusions regarding the evidence. Therefore, the trial court's opinion that counsel was not ineffective in this regard is not contrary to or an unreasonable application of *Strickland*.

**12.**

Next, Petitioner argues that counsel was ineffective in failing to request the appropriate

accident instruction.  Petitioner argues that CJI 2d 7.2 should have been used.  The Michigan

Court of Appeals held that this instruction would not have been appropriate as it was inconsistent

with the defense and that the accident instruction given was appropriate.  Petitioner has not

shown that the state court's conclusion was incorrect.  Therefore, counsel was not ineffective in

failing to request an instruction not warranted by the testimony.

**13.**

Finally, Petitioner argues that his trial attorney was ineffective in failing to impeach

prosecution witnesses Lolita McCall and Anita Stone.  Petitioner argues that counsel should

have impeached these witnesses "with their motive to slant their testimony in favor of the State."

Petitioner's brief at 33.  The trial court rejected Petitioner's conclusory claim:

> The defendant states that defense counsel never questioned either of these
> [witnesses] as to their motive to testify in favor of the prosecution.  He does not
> specifically state how this would bolster his case.  Nor does he point to anything
> in their background/history which would impeach their credibility.  This Court
> finds that there was no basis for or need to impeach these witnesses and the
> failure to do so was not ineffective assistance of counsel.

*Ratajczak*, slip op. at 9.

Defense counsel's cross-examination of Lolita McCall was effective.  Her testimony was

very incriminating, but defense counsel highlighted inconsistencies between her preliminary

examination testimony and trial testimony.  Petitioner gives no specific indications of questions

that should have been asked which would have impeached McCall.

Anita Stone was a prosecution witness.  However, he testimony clearly evidenced her

desire not to implicate Petitioner.  She acknowledged that, while she would not perjure herself,

her loyalties lay with Petitioner. The transcript shows that, during directly examination, Stone frequently seemed reluctant to answer questions and had to be prodded by the prosecutor. Thus, Petitioner's claim that Stone was motivated to slant her testimony in favor of the State is not supported by the record. Defense counsel's cross-examination of Stone was effective and elicited testimony to support the defense theory.

The Court therefore denies this ineffective assistance of counsel claim.

## F.

Finally, Petitioner challenges the state court's application of Michigan Court Rule 6.508(D). Violations of state law and procedure which do not infringe specific federal constitutional protections are not cognizable claims under 28 U.S.C. § 2254. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "Whether . . . Michigan courts complied with the procedural requirements of Michigan law is not a matter . . . to decide on a petition for habeas corpus relief. . . . [T]he relevant inquiry is only whether the state court decision was in violation of [a petitioner's] federal constitutional rights." *Hayes v. Prelesnik*, 193 F. App'x 577, 584 (6th Cir. 2006). Petitioner has not shown that the state court's application of Mich. Ct. R. 6.508(D) was contrary to or an unreasonable application of clearly established federal law. Therefore, habeas relief is denied on this claim.

## V.

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 Proceedings, which was amended as of December 1, 2009, requires that a district court must:

issue or deny a certificate of appealability when it enters a final order adverse to the applicant. . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).

Rule 11, Rules Governing Section 2255 Proceedings.

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Courts must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed.2d 931 (2003) (internal quotes and citations omitted).

The Court finds that reasonable jurists could find its resolution of the following claims to be debatable or wrong: that Petitioner's constitutional rights were violated when jurors performed a trigger pull test outside Petitioner's presence; that the prosecutor committed misconduct in arguing that police would not fail to respond to a misdemeanor-related call; that counsel was ineffective in failing to elicit testimony that Petitioner was struck by Evans on the day of the shooting; and that counsel was ineffective in failing to object when the prosecutor called Petitioner a liar. Accordingly, the Court will grant a certificate of appealability on these claims.

With respect to the remaining claims, the Court finds that reasonable jurists would not debate that this Court correctly denied each of these claims. Therefore, the Court will deny a certificate of appealability on the remaining claims.

## VI.

Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States.

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus [dkt. # 1] is DENIED.

IT IS FURTHER ORDERED that a certificate of appealability is GRANTING IN PART AND DENIED IN PART. It is granted for the following claims: that Petitioner's constitutional rights were violated when jurors performed a trigger pull test outside Petitioner's presence; that the prosecutor committed misconduct in arguing that police would not fail to respond to a misdemeanor-related call; that counsel was ineffective in faling to elicit testimony that Petitioner was struck by Evans on the day of the shooting; and that counsel was ineffective in faling to object when the prosecutor called Petitoner a liar. It is denied for the remaining claims.

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: June 2, 2010

I hereby certify that a copy of the foregoing document was served upon parties/counsel of record on June 2, 2010, by electronic and/or ordinary mail.

s/Catherine A. Pickles
Judicial Secretary